## A99A0490. CITY OF GRIFFIN v. JACKSON.
### (520 SE2d 510)

RUFFIN, Judge.

Laurenda Jackson sued the City of Griffin for injuries she allegedly sustained when her automobile collided with a police vehicle driven by Officer Kenneth English of the Griffin Police Department.

The trial court struck the city's answer as a discovery sanction for failing to produce certain photographs the city had taken of the scene of the collision. The city appeals, contending that there was no evidence of wilfulness and that the trial court erred in requiring it to pay for certain depositions taken in an attempt to locate the photographs. We affirm.

Shortly after the collision, Gail Burel Mullins, an investigator for the Griffin Police Department, took photographs of the collision scene. Mullins turned over two rolls of film to Lieutenant Michael Suhr at the scene. A second set of photographs was taken by Gallagher-Bassett, the company that administered the city's insurance claims, of the vehicles at the wrecker lot, as well as pictures of the accident scene apparently taken after the vehicles had been removed.

In her initial discovery requests, served August 21, 1995, plaintiff specifically asked for production of any photographs of the scene or vehicles involved. The city responded on October 3, 1995, stating that there were no photographs, even though the accident report produced by the city clearly indicated that photographs had been taken by Mullins. Plaintiff served the city with a second request for production, specifically asking for production of the photographs taken by Mullins. The city responded on November 14, 1995, by stating that it "is in possession of certain photographs taken by its employees relative to this incident. Those photographs will be produced at a mutually convenient time and place. Defendant is not aware of the existence of any negatives of those photographs."

Notwithstanding its admission that it was in possession of the photographs, the city did not produce the photographs as promised. On August 15, 1996, plaintiff filed a motion to compel production of the photographs and certain other documents. In a response filed on September 16, 1996, the city reiterated its offer to produce the photographs taken by Mullins at a mutually convenient time and place and again stated that it did not possess any negatives. At a March 11, 1997 hearing on the motion, when asked by the trial court if he had the pictures, the city's attorney stated that "I don't have them with me, no. I'm going to have to go get them." The court orally ordered production of the pictures.

Despite the trial court's order, the city still did not produce the photographs. On May 16, 1997, 18 months after first stating that it would produce the Mullins photographs, the city filed a motion for protective order, claiming that it was unable to locate the photographs. It submitted affidavits from Chief of Police Armand Capeau and Corporal James Landham stating that they had performed a diligent search for the photographs but could not find them. The city also for the first time revealed the existence of the Gallagher-Bassett photographs, which it produced. The trial court denied the city's

motion for protective order and, in response to plaintiff's motion for sanctions, allowed plaintiff to take several depositions, at the city's expense, in an attempt to determine what happened to the Mullins photographs. In particular, the court ordered that plaintiff be allowed to depose Mullins, "the person she allegedly gave [the film] to, the person who actually developed the photos, and Officer Landham."

In a hearing after plaintiff had deposed Mullins and Landham, the city's attorney represented to the court that Mullins had given the rolls of film to Lieutenant Suhr, who took them to Jim & Joe's photography shop to be developed. The attorney represented that "Lieutenant Suhr has no recollection of what happened to [the photos] after they went to Jim & Joe's, no recollection at all." However, when he was subsequently deposed, Suhr testified that he clearly remembered picking up the photographs from Jim & Joe's, and that he gave them and the case file to Commander Marvin Barrow, the head of the patrol division. Suhr testified that he personally showed each of the pictures to Barrow and explained them to him. Barrow, who retired in May 1997, testified that the photographs were not in the case file Suhr gave him, and that he never saw any photographs. Barrow also claimed that he received the file from Suhr on the day of the accident, not a few days later as Suhr claimed.

In its order striking the city's answer, the trial court found that the city had given no reasonable explanation for its failure to produce the photographs. In particular, the court noted that the city "repeatedly promised to produce the photographs, and assured the Court that the photographs were in the Defendant's possession, when in fact they either were not, or had been destroyed, or lost." The court found that the city's refusal to produce the photographs was not in good faith, and that the city

unjustifiably expanded and delayed the discovery proceedings. Defendant not only failed to produce the photographs as initially requested, but also failed to provide the Court and counsel with the City's best knowledge of the last whereabouts of the pictures.

1. In two enumerations, the city contends that the trial court erred in striking its answer because there was no evidence of wilfulness. We disagree.

We have previously held that the drastic sanction of striking a defendant's pleadings for failure to comply with a discovery order may not be imposed unless

the failure is wilful, in bad faith or in conscious disregard of

an order. However, a very broad discretion is granted judges in applying sanctions against disobedient parties in order to assure compliance with the orders of the courts. By OCGA § 9-11-37 (b) (2) (C) the courts are specifically granted the discretion to dismiss complaints or to render default judgments against disobedient parties. This applies to the disobeying of an order to produce. Historically it has been the policy of the Georgia appellate courts to refuse to interfere with a trial court's exercise of its discretion in absence of abuse. This policy is applicable to a trial judge's exercise of the broad discretionary powers authorized under the discovery provisions of the Civil Practice Act.

(Citation and punctuation omitted.) *Joel v. Duet Holdings*, 181 Ga. App. 705, 707 (353 SE2d 548) (1987). Furthermore,

[t]here is no requirement that the plaintiff display and the trial court find actual wilfulness. The sanction of dismissal for failure to comply with discovery provisions of the Civil Practice Act requires only a conscious or intentional failure to act, as distinguished from an accidental or involuntary non-compliance. A conscious or intentional failure to act is in fact wilful. Where a motion for sanctions is brought under OCGA § 9-11-37 (b) (2) for a party's failure to comply with an order compelling responses to discovery requests, the existence or nonexistence of wilfulness should be considered not only in the context of the time period prescribed in the order compelling answers, but in the context of the entire period beginning with service of interrogatories and ending with service of answers. Events transpiring during this entire time period are probative of whether appellant acted with conscious indifference to the consequences of failure to comply with the order compelling answers.

(Punctuation omitted.) *Resource Network Intl. v. Ritz-Carlton Hotel Co.*, 232 Ga. App. 242 (1) (501 SE2d 573) (1998). "In determining whether a party has abused discovery, the trial court sits as trier of fact, and this Court will uphold a finding of wilful discovery abuse if there is any evidence to support it." *Santora v. American Combustion*, 225 Ga. App. 771, 772 (1) (a) (485 SE2d 34) (1997).

In essence, the city contends that there can be no finding of wilfulness because there is no direct evidence that it maliciously destroyed the photographs in order to avoid producing them to plaintiff. As discussed below, although there is no "smoking gun" evidence showing how the photographs were destroyed or lost, we believe

there was sufficient evidence to support an inference of wrongful conduct by the city. However, it is not necessary to show intentional destruction or hiding of the photographs to support the imposition of sanctions. What is necessary is a showing that the city acted "wilful[ly], in bad faith or in conscious disregard" of its discovery obligations. *Joel*, supra. Regardless of how the photographs came to be missing, the evidence was sufficient to show a consistent pattern of conduct by the city calculated to frustrate any attempt to locate the photographs and to mislead the court and the plaintiff as to the fate of the photographs. See *Santora*, supra (wilful attempt to conceal material document supported sanction of dismissal).[1]

Although the city now claims that the Mullins photographs have been missing since before plaintiff made her first discovery request, the city admitted in its November 14, 1995 discovery responses that it was in possession of the photographs. This admission was not withdrawn in the city's May 16, 1997 motion for protective order, which simply stated that the city was unable to locate the photographs at that time. Regardless of whether the earlier pleading constitutes a binding admission in judicio that the photographs were in the city's possession as of November 14, 1995, see *Ford v. Uniroyal Goodrich Tire Co.*, 231 Ga. App. 11, 14 (497 SE2d 596) (1998), it at least constitutes evidence of that fact. See *Aycock v. Calk*, 228 Ga. App. 172, 173 (491 SE2d 383) (1997). Moreover, in both the November 14, 1995 and September 16, 1996 discovery responses, the city stated that, while it was in possession of the photographs, it did not have any negatives. The specificity of these responses suggests that they were based upon an actual search of the records and were not simply inaccurate. Furthermore, the city's attorney suggested at the March 11, 1997 hearing that the photographs were still in the city's possession, and that he merely had to "go get them." At the hearing on the motion for sanctions, the attorney stated that, when he was preparing the discovery responses, he had been specifically told by his client that it had the photographs. Thus, there was clearly evidence that the city had the photographs at the time they were requested by plaintiff and ordered to be produced by the court, but that the photographs subsequently disappeared.

It is at least arguable that the mere disappearance of photographs within the control of a party, which have been the subject of litigation for more than a year and which the party has repeatedly promised and been ordered to produce, can support an inference of bad faith, particularly where the party offers no explanation as to

---

[1] *Chapman v. Auto Owners Ins. Co.*, 220 Ga. App. 539 (469 SE2d 783) (1996), cited by the city, is inapposite in that it did not involve dismissal for discovery abuse.

how they disappeared. The trial court clearly found the city's explanation that the photographs were simply lost to be unpersuasive. Indeed, the court specifically found that "no factual explanation has been offered" to explain the disappearance of the photographs and that the city's refusal to produce the photographs "was not in good faith."

Moreover, in addition to the simple disappearance of the photographs, there are several other factors which would support an inference of bad faith on the part of the city, with respect both to the disappearance of the photographs and to the city's subsequent attempts to comply with its discovery obligations by locating and producing the photographs. In particular, the evidence regarding Lieutenant Suhr and the purported investigation performed by Chief Capeau and Corporal Landham casts doubt on the city's good faith.

### Evidence Regarding Lieutenant Suhr

As discussed above, on July 17, 1997, the trial court ordered that plaintiff be allowed to depose certain individuals, including Mullins, Landham, and "the person [Mullins] allegedly gave [the film] to." The court asked the city's attorney to whom Mullins gave the photographs, and he responded, "I don't know. But, we can certainly find out." Notwithstanding this assurance, no one from the city contacted Mullins after this hearing to determine to whom she gave the film. On July 30, 1997, plaintiff served the city with a notice of deposition, requesting that the city produce Mullins and Landham for deposition and designate other individuals to testify as ordered by the trial court on July 17. However, the city did not produce Lieutenant Suhr at the scheduled deposition because plaintiff had not identified him by name in her notice of deposition, although it is apparent that the city knew by this time that Suhr was the individual to whom Mullins gave the film. Mullins testified at her deposition that she had advised Chief Capeau of that fact in May 1997, well before the July 17 hearing at which the city's attorney stated that he did not know to whom Mullins had given the film.

In a hearing on September 18, 1997, plaintiff's attorney asked the court to strike the city's answer because, among other things, it did not produce Lieutenant Suhr for deposition as required by the court's order. In response, the city's attorney stated that he was willing to produce Lieutenant Suhr, but represented to the court and to plaintiff's counsel that Suhr "took [the rolls of film] to Jim & Joe's [photography shop] and provided them to Jim & Joe's. He has no knowledge of what happened to them after that. . . . Lieutenant Suhr has no recollection of what happened to them after they went to Jim & Joe's, no recollection at all."

The trial court denied the motion to strike the city's answer at that time, but ordered that Suhr be produced for deposition. At his deposition, Suhr flatly contradicted the representations made by the city's attorney. Suhr testified that he had a positive recollection that he picked up the developed photographs from Jim & Joe's photography shop, and that he gave them and the case file to Commander Barrow. He testified that he personally went over each photograph with Commander Barrow, and that he anticipated Barrow would discuss the file with the police chief and that the file would then be reviewed by the police review board.

Lieutenant Suhr's testimony is clearly very important in showing the city's possession of the photographs, particularly in light of Commander Barrow's positive denial that he ever received or saw the photographs. The contradictions between Suhr's and Barrow's testimony are irreconcilable: if Suhr is telling the truth, then Commander Barrow apparently is not, which would strongly support an inference of bad faith on the part of the city. By failing to initially produce Lieutenant Suhr for deposition, as clearly contemplated in the court's order and in plaintiff's notice of deposition, and then positively misrepresenting to the court and to plaintiff's counsel that Suhr had no knowledge of what happened to the photographs after the film was delivered to Jim & Joe's, it appears that the city was attempting to prevent plaintiff from discovering relevant and damaging information regarding the fate of the photographs. Indeed, it is difficult to conceive of a good faith explanation for counsel's blatant misrepresentation to the court as to the nature of Suhr's knowledge, and the city makes no attempt to provide such an explanation in its appellate brief. This incident suggests bad faith by the city regardless of whether counsel himself intended to mislead the court and the plaintiff or whether counsel was in fact misled by his client.

### The Capeau/Landham Investigation

As discussed above, on May 16, 1997, the city filed affidavits from Chief of Police Armand Capeau and his administrative assistant, Corporal James Landham, in support of its motion for a protective order. In his affidavit, Chief Capeau stated that the whereabouts of the photographs had been unknown since *before* plaintiff's first request for production. This statement flatly contradicts the city's affirmative representation in its November 14, 1995 discovery responses that it was in possession of the photographs and also contradicts counsel's statement to the court in August 1998 that, when preparing the discovery responses, he was told by the city that it had the photographs.

In his affidavit, Capeau also stated that he had assigned Corpo-

ral Landham the task of locating the missing photographs, instructing him to "use every means at his disposal to locate the photographs as quickly as possible." In his affidavit, Landham stated that he had personally consulted with all police department employees who to his knowledge may have had possession, custody, or control of the photographs at any time. Landham also stated that he had directed searches of the offices of all such employees, as well as every location in the police department where photographs are normally located. However, in his subsequent deposition, it became apparent that Landham had conducted a very minimal search for the photographs over a period of a few days, while Chief Capeau was out of town, and that the chief did not provide him with any of the basic information necessary to perform an effective search. Indeed, Landham testified that he was not provided with the case file or any other documents relating to the case, and that he did not review any documents whatsoever during the course of his investigation. He was unable to look at the case file because it was locked in the chief's office, to which he did not have access. Landham never interviewed Mullins because he did not know who took the photographs. He never interviewed Lieutenant Suhr or Commander Barrow and was unaware of their involvement with the photographs until so informed by plaintiff's counsel at the deposition. He never saw a copy of Lieutenant Suhr's report showing that Suhr ordered Mullins to take the photographs, or a copy of the accident report reflecting that Mullins had done so. Landham also did not check any of the department's computer records relating to evidence and did not seek to determine whether there was a chain of custody form relating to the photographs. It appears that the sum total of Landham's investigation consisted of (1) looking through the files in the chief's secretary's office; (2) asking the evidence custodian to check the evidence room; (3) asking representatives of Jim & Joe's and another photography shop whether they had the photographs; and (4) asking Commander Herman Parker, the head of the investigative services division, whether he had the photographs.

Mullins testified that in May 1997 she told Chief Capeau that she had given the film to Lieutenant Suhr. However, Capeau never informed Landham of this fact and stated that he did not recall any such conversation with Mullins. It seems clear that the affidavits provided by Chief Capeau and Corporal Landham did not accurately depict the nature of their "investigation" into the fate of the missing photographs. Indeed, a reasonable inference may be drawn that Chief Capeau had Corporal Landham perform a sham search for the photographs, without any intent to discover their true fate.

We believe that, taken together, all of the evidence would support an inference that the city destroyed or concealed the photo-

graphs after they were requested to be produced. However, even if the photographs were lost by accident, the evidence supports an inference that the city wilfully failed to comply with its discovery obligations by, among other things: (1) conducting a sham search for the photographs, while concealing from the investigator the identity of several individuals known by Chief Capeau to have had access to the photographs (i.e., Mullins, Suhr, and Barrow); (2) providing misleading affidavits that mischaracterized the nature of the city's investigation and that failed to disclose relevant facts known to the city, in an attempt to obtain a protective order after the court had ordered production of the photographs; (3) affirmatively misrepresenting the knowledge of a key witness known to the city, in an apparent attempt to mislead the court and plaintiff about the necessity of deposing the witness; and (4) providing conflicting accounts as to when the city determined that the photographs were missing. These facts were sufficient to demonstrate that the city acted with "conscious indifference to the consequences of failure to comply with the order compelling [production]." *Resource Network Intl.*, supra. Accordingly, the trial court did not abuse its discretion in striking the city's pleadings.[2]

2. Without citing any authority, the city contends that the trial court erred in requiring it to pay plaintiff's attorney fees for taking depositions to determine the fate of the photographs. OCGA § 9-11-37 (b) (2) provides that, if a party fails to obey an order to provide discovery, the court "may make such orders in regard to the failure as are just . . . [and may] require the party failing to obey the order . . . to pay the reasonable expenses, including attorney fees, caused by the failure." Where a defendant first states that it does not have material items sought in a request for production, and then states that it does have them and will produce them, and then states that it cannot find them but provides no explanation as to their fate, we think it is perfectly reasonable for the trial court to allow the plaintiff to take discovery to ascertain the fate of the items and to cast the costs of such discovery on the defendant.

*Judgment affirmed. McMurray, P. J., and Andrews, P. J., concur.*

DECIDED JULY 7, 1999 —
RECONSIDERATION DENIED JULY 29, 1999

---

[2] Because the only issue raised in the city's enumerations is whether there was evidence of wilfulness, we do not consider whether a lesser sanction would have been more appropriate in this case.

*Jenkins & Nelson, Frank E. Jenkins III, Robert W. Lamb*, for appellant.
*Alan W. Connell*, for appellee.